**LAW OFFICES OF**
**MICHAEL S. KASANOFF, ESQ.**
157 Broad Street, Suite 321
P.O. Box 8175
Red Bank, NJ 07701
(732) 747-5348
mkasanoff@att.net

*Attorneys for Plaintiffs*
*Medical Marketing Specialists, Inc.*
*and Michael Clemente*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEDICAL MARKETING SPECIALISTS, INC. a New Jersey corporation, and MICHAEL CLEMENTE, | Civil Action No. 3:08-cv-06391 (AET)(TJB) |
| Plaintiffs, | ***Document Electronically Filed*** |
| vs. | |
| EMPIRE BUSINESS SOLUTIONS, LLC, a Delaware limited liability company, EMPIRE BUSINESS BROKERS, INC., a Delaware corporation, EMPIRE BUSINESS BROKERS USA, a Delaware corporation, BUSINESS BROKERS OF AMERICA USA, INC., a Delaware corporation, EMPIRE GLOBAL STRATEGIES, INC., a Delaware corporation, NICHOLAS R. GUGLIUZZA, LORI GUGLIUZZA, EMPIRE BUSINESS ASSOCIATES, INC., a Delaware corporation, ROBERTA CAPUTO, EMPIRE BUSINESS SOLUTIONS, INC., a Delaware corporation, MIRABILIS VENTURES, INC., a Nevada corporation, HOTH HOLDINGS, INC., a Nevada corporation, AEM, INC., a Nevada corporation, WELLINGTON CAPITAL, INC., a Nevada corporation, WTS RISK, LLC, a Nevada limited liability company, MVI GLOBAL, INC., a Nevada corporation, CENTER EXECUTIVE OFFICES CORPORATION, a Nevada corporation, | **SECOND AMENDED COMPLAINT & JURY DEMAND** |

1

| | |
|---|---|
| WORKERS TEMPORARY STAFFING, INC., a Nevada corporation, FRANK AMODEO, R.W. CUTHILL, JR., ROBERT CUTHILL, MICHAEL MOECKER, FERNANDO SIMO, SHANE WILLIAMS, JODI JAIMAN, JAY STOLLENWERK, THOMAS J. BEAN, GAILLE HARTMAN, KEVIN MUNROE, JOHN DOE OFFICERS and DIRECTORS, A-Z, ABC CORPS. 1-10, and JOHN DOES A-Z, <br><br> Defendants. | |

Plaintiffs, Medical Marketing Specialists, Inc. (hereinafter "MSI") and Michael Clemente (hereinafter "Clemente") (collectively referred to as "Plaintiffs"), by and through its counsel, Michael S. Kasanoff, Esq., state the following as and for its Second Amended Complaint against Defendants:

**PARTIES**

1.      Plaintiff, Medical Marketing Specialists, Inc. (hereinafter "MSI"), is a New Jersey corporation with its principal place of business at 133 Lanes Mill Road, Howell, New Jersey.

2.       Plaintiff, Michael Clemente, is a citizen of the State of New Jersey, residing at 133 Lanes Mill Road, Howell, New Jersey.

3.      Clemente, the founder and Chief Executive Officer of MSI, has significant experience analyzing medical and dental offices, and applies the company's unique expertise to market and grow the practices, by promoting alternative treatments as compliments to traditional healthcare, merging all aspects of alternative medicines, and integrating them with conventional medicine.

2

4.      Empire Business Solutions, LLC is a Delaware limited liability company with a principal place of business at 4040 Clinton Street, Buffalo, New York, 14224.  Upon information and belief, Nicholas Gugliuzza is the sole principal and owner of this entity.

5.      Empire Business Brokers, Inc. is a Delaware corporation and has a principal place of business at 527 Meadow Drive, Buffalo, New York 14224.  Upon information and belief, Nicholas Gugliuzza is the founder, Chief Executive Officer, and President of this entity.

6.      Empire Business Brokers USA is a Delaware corporation and has a principal place of business at 4040 Clinton Street, Buffalo, New York, 14224.  Upon information and belief, Nicholas Gugliuzza is the founder, President, and a shareholder of this entity.

7.      Business Brokers of America USA, Inc. is, upon information and belief, a Delaware corporation and has a principal place of business at 527 Meadow Drive, Buffalo, New York 14227.  Upon information and belief, Nicholas Gugliuzza is the founder, Chief Executive Officer, and President of this entity.

8.      Empire Business Solutions, Inc. is, upon information and belief, a Delaware corporation and has a principal place of business at 1967 Wehrle Drive, Buffalo, New York 14227.  Upon information and belief, Nicholas Gugliuzza is the founder, Chief Executive Officer, and President of this entity.

9.      Empire Global Strategies, Inc. is, upon information and belief, a Delaware corporation and has a principal place of business at 1967 Wehrle Drive, Buffalo, New York 14227.  Upon information and belief, Nicholas Gugliuzza is the founder, Chief Executive Officer, and President of this entity.

10.     Empire Business Associates, Inc. is, upon information and belief, a Delaware corporation and has a principal place of business at 450 SW 12th Avenue, Deerfield Beach,

#1341564 v3
108732-64612

Florida 33442.  Upon information and belief, Nicholas Gugliuzza and Roberta Caputo are the founders, Officers, Directors, and Shareholders of this entity.

11.     Nicholas R. Gugliuzza (hereinafter "Gugliuzza") is the founder, Chief Executive Officer, and/or President of Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc., Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc. (collectively referred to as "Empire").  Although his residential address is currently unknown at this time, upon information and belief, Gugliuzza is both a citizen and resident of the State of New York.

12.     Lori Gugliuzza is the wife/former wife of Nicholas R. Gugliuzza, is/was an officer/director/shareholder in Empire, and resides at at 527 Meadow Drive, Buffalo, New York 14227.

13.     Defendants have operated as one common enterprise, without distinguishing among separate corporate forms, both in the way they hold themselves out to the general public, and in connection with the facts and claims alleged herein.

14.     Mirabilis Ventures, Inc., Hoth Holdings, Inc., AEM, Inc., Wellington Capital Group, Inc., Wts Risk, L.L.C., Payroll Concepts, Inc., Mvi Global, Inc., Center Executive Offices Corporation, Workers Temporary Staffing, Inc. ("Mirabilis") are, upon information and belief, Nevada corporations, sister entities, and corporate alter-egos, having a principal place of business at 341North Maitland Avenue, Suite 210, Maitland, Florida 32751, and using LSEB Agent Services, Inc., 390 North Orange Avenue, Orlando, Florida 32801 as its registered agent. Upon information and belief, Frank Amodeo founded and controlled this entity until Amodeo was convicted and sentenced to 22 years in prison for one of the largest tax and money laundering schemes in IRS history.   Upon further information and belief, R.W. Cuthill, Jr., is the

4

President of Mirabilis, and its Directors are/were Robert Cuthill, Michael Moecker, Fernando Simo, Shane Williams, Jodi Jaiman, Jay Stollenwerk, Thomas J. Bean, Gaille Hartman, Kevin Munroe, and perhaps others whose identities are not known at this time.

15. Mirabilis, its officers and directors are liable as successors by operation of law as result of Mirabilis's merger/acquisition of Empire which took place on or about December 15, 2005.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiffs and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interests and costs, exceeds the sum of $75,000.00.

17. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) in that, *inter alia*, a substantial part of the events giving rise to the claims herein occurred in this district and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## NATURE OF THE ACTION AND RELIEF SOUGHT

18. This case involves an astoundingly brazen fraud, replete with deceit, lies, and neglect, in which Clemente retained Defendants to sell its niche business, which at the time had no competition and was positioned to receive maximum value. Defendants repeatedly and continually assured Plaintiffs that Empire could sell the business quickly and for a price of at least $30 million, and that Defendants had several buyers lined-up and ready to purchase. Defendants knew that because the sale had a very short 'shelf life,' time was of the essence in order to receive maximum value. Yet despite fully knowing that time was of the essence,

5

Defendants breached their fiduciary duties to Plaintiffs by making absolutely no effort whatsoever to sell Plaintiffs' company over the next 2 ½ years, but embarked on a continuous scheme of deceit, lying to Plaintiffs about how many buyers they had and how close they were to completing an imminent sale for $30 million initially, and later on $300 million.

19.     For more than 20 years, MSI has been building businesses focused in the medical, dental, and healthcare industries.  MSI does this by analyzing medical and dental offices, and applying its expertise to market and grow the practices.  MSI's approach is particularly unique in that MSI promotes alternative treatments as compliments to traditional healthcare by merging all aspects of alternative medicines and integrating them with conventional medicine.

20.     Specifically, MSI integrates conventional medicine with state-of-the-art modalities from the Middle East, the Far East, and Europe, that are approved by the Federal Drug Administration and comply with American Medical Association guidelines.  This especially signifies MSI's uniqueness because medical doctors schooled in the United States have a very limited understanding of cellular medicines and the various treatment modalities. MSI's methodology allows its clientele to offer patients complete wellness programs, coordinating naturopathic doctors, herbalists, homeopaths, chiropractors, acupuncturists, and other therapies such as intravenous vitamin therapies and immune enhancers, to compliment the medical doctor in fighting off disease.  Further, MSI affiliated with the largest world renowned cellular testing labs to perform in-depth cellular testing for purposes of diagnosing disease before it could manifest within the patient.  Various clinicians are integrated to enhance the following therapies: IV vitamin therapy, chelation therapy, intravenous immunoglobin therapy, oxidative therapies, therapies producing an autogenous effect, hormonal therapy, push therapy, and longevity therapy, along with a host of others that are added on a regular basis.

#1341564 v3
108732-64612

21.     Plaintiffs were looking to sell MSI at a time when it was particularly ripe for sale, considering that MSI's novel concepts and techniques were not available through conventional practitioners, and to the best of Plaintiffs' knowledge, no one was offering the package of programs MSI provided, leaving the market essentially to themselves.   Without any real competition, Plaintiffs could charge what the market could bear, as Plaintiffs possessed a lucrative, fast-growing business model and concept, with the potential for both high profit and rapid expansion.

22.     Defendant Empire was chosen from among several business brokerage firms to carry out the sale of MSI.

23.     Founded by Gugliuzza in 1981, Empire, with more than 70 offices in the United States, Mexico, Spain, and Central America, represents itself as an international network of business brokers professionally dedicated to the sale and purchase of ongoing businesses and franchises, while also providing consulting services to buyers, investors, entrepreneurs, and franchises.   Upon information and belief, Empire is a member of the International Business Brokers Association ("IBBA").

24.     After initial contact and several months of courting by Empire and Gugliuzza with weekly telephone calls, Gugliuzza enticed Clemente with promises of an "easy sale" and a lucrative return.   Gugliuzza took a seemingly avid interest in MSI, taking all of Clemente's calls, asking questions about MSI, and assuring a multi-million dollar result.   The courting of MSI and Clemente's business was capped by Gugliuzza's representation that a group of European doctors were interested in immediately purchasing the company.   Based on this representation, Clemente entered into the Exclusive Business Listing Agreement with Gugliuzza's company to sell MSI.   However, after the agreement was signed and the fee required paid, Gugliuzza and Empire made

7

no efforts to sell, market, or promote MSI.  After the alleged interest from the European doctors fell through, Gugliuzza would repeatedly conjure up another claimed interested party that would ultimately fizzle without a trace, just like the last.  The cyclical conduct was able to divert any discontent with Empire or Gugliuzza's efforts by masking its nonfeasance with fabricated reports of various interested parties.  Empire and Gugliuzza's efforts sustained this charade, stringing Clemente along for 2 ½ years, by which time the competition caught up with MSI's innovative techniques and processes, rendering the value of the company essentially worthless.

25.     Plaintiffs bring this action to recover damages, compensatory, treble and punitive, arising from Defendants' wrongful acts in fraudulently inducing Plaintiffs to enter into the brokerage contract, and after which Defendants' malfeasance and nonfeasance caused a breach of the agreement and constituted malpractice, unconscionable commercial practices, fraud, and breach of fiduciary duty, causing Plaintiffs to suffer significant harm and damage.

26.     Plaintiffs also seek such other and further relief, at law or in equity, as the Court deems just and proper.

## STATEMENT OF FACTS

27.     In December 2002, Roberta Caputo, working out of Empire's franchise in Deerfield Beach, Florida, responded to a letter in which MSI sought investors and/or buyers for the company.   Ms. Caputo placed Plaintiff Clemente of MSI in direct contact with Defendant Gugliuzza of Empire, noting that Gugliuzza had more experience with bigger sales.

28.     After a series of lengthy conversations over the course of about 6 months, in which Clemente explained MSI's business concept and model, Gugliuzza assured Clemente that Empire could sell MSI very quickly for a sum of at least $30 million and possibly a lot more. Gugliuzza assured Clemente that it would be an "easy sale" for him and his national network of

business brokers and that he, in fact, already had buyers lined up, a group of European doctors, who were interested in purchasing MSI.

29.     Clemente made it abundantly clear that time was of the essence in the sale of MSI as the company's uniqueness in the healthcare field was volatile and competition would inevitably catch on.

30.     Based upon Gugliuzza's representations, in or about May or June 2003, Plaintiffs provided Defendants with a $10,000 retainer, and exclusivity on the listing.  Plaintiffs also provided Defendants with 44 crates of documentation, containing several hundred thousand pages of documents including MSI's financials and other information regarding the company.  In exchange, Plaintiffs expected that Defendants would quickly package MSI, and take it to market.

31.     Despite these representations, Defendants inexplicably failed to perform.  After the passage of several weeks, Gugliuzza became difficult, if not impossible, to reach.  When Plaintiffs finally contacted Gugliuzza, he again assured them that it was an "easy sale."  He told Plaintiffs that although they could not always reach him, he worked through his franchises, which meant that he had over 100 people actively marketing to sell MSI, which he again assured, would sell very fast.

32.     When pressed about the progress with the European doctors in August of 2003, Gugliuzza informed Clemente that the interest on the part of the European doctors had waned, but that he now had a group of investment bankers who were interested in buying the company.

33.     Despite the disappointment of the failed sale to the European doctors, Gugliuzza placed Clemente at ease with the prospect of new investors.  However, over the course of the following weeks, Gugliuzza reported that the sale to the investment bankers fell through, but that

#1341564 v3
108732-64612

Empire was discussing the sale of the company to another party, this time a group of foreign investment bankers.

34.     Over the course of the following month, Gugliuzza became increasingly difficult to contact.  When Gugliuzza finally decided to answer one of Clemente's many phone calls, it was to inform Clemente that the so-called "foreign investment bankers" were no longer interested in MSI.  But, as always, Gugliuzza paraded the next alleged potential investor.

35.     Throughout the winter of 2003 and 2004, Gugliuzza paraded a series of prospective purchasers, one after the other, including two doctors from St. Lucia, an investor from South America, a multi-level nutrition company, a chiropractic equipment company, and Bayer.  When one potential sale fell through or interest waned, Gugliuzza reassured Clemente that a quick sale would be forthcoming, listing the next interested suitor.  In fact, at one point, Gugliuzza inspired great excitement when he advised Plaintiffs that MSI was the subject of a bidding war between three buyers starting at $30 million.

36.     In the winter of 2004, Gugliuzza informed Clemente of interest from a medical equipment company.  After a few weeks without contact, despite Clemente's numerous attempts to obtain information, Gugliuzza called Clemente and informed him that MSI had been sold for approximately $35 million.

37.     Following weeks of conversations, in which Gugliuzza and Clemente discussed the details of this "completed" sale, phone calls from Gugliuzza suddenly stopped and Gugliuzza was again impossible to reach.  After approximately two to three weeks, Clemente finally was able to speak with Gugliuzza who advised that the deal fell through.  Nevertheless, Gugliuzza, once again, absolutely reassured Clemente he had several other prospects who were extremely interested in purchasing his business and that he would find a buyer in short time.

10

38.     After the passage of a couple months with no visible signs of progress, Clemente inquired as to how much work and effort Gugliuzza was really putting into the sale.  Gugliuzza responded over the next couple months with a multitude of excuses but no tangible results.

39.     At that point, Clemente began to aggressively question Gugliuzza about the lack of progress.  Plaintiffs made numerous phone calls and sent Defendants multiple e-mails, stressing that time was of the essence, because Plaintiffs' unique market position was deteriorating, as competitors began to emerge in New York and New Jersey.  Gugliuzza responded to these concerns by hiding from Clemente altogether.

40.     Plaintiffs began demanding to see some evidence of work performed, including the identities and contact information of the individuals or groups making the offers and a copy of MSI's Business Profile which Gugliuzza swore he had written.  Despite the passage of more time, this information and documentation was never provided.

41.     In the spring of 2004, with frustration starting to mount, Gugliuzza remained difficult to reach by phone.  Upon finally making contact, Gugliuzza advised Clemente that he was too busy to be involved in the sale of MSI and referred Clemente back to Roberta Caputo due to her connections and the potential buyers working out of Ms. Caputo's area.

42.     As directed, Clemente contacted Ms. Caputo, who upon speaking with Clemente made the recommendation that MSI should not be sold, but rather franchised.  Because Ms. Caputo did not deal with franchising, she referred Clemente back to Gugliuzza who deals with franchising work for Empire.

43.     When initially discussed, Gugliuzza seemed to question the idea of franchising, but in subsequent conversations, Gugliuzza strenuously encouraged the plan to franchise MSI, agreeing with Ms. Caputo's recommendation.  Gugliuzza assured Plaintiffs that if they took a

#1341564 v3
108732-64612

year or so to sell 12 franchises nationwide, and then placed MSI on sale, Gugliuzza could get

Plaintiffs over $300 million for the company – ten times the value that Gugliuzza had originally

promised.   Gugliuzza on the surface supplanted Ms. Caputo and assumed total control of the

project, claiming that he was the only one at Empire who was capable of successfully carrying

out the franchising program, but upon information and belief, Ms. Caputo continued to assist

Gugliuzza in mishandling Plaintiffs' project.

44.     In or about May 2004, with the Exclusive Business Listing Agreement set to

expire, Gugliuzza offered to renew the agreement, at no charge to Clemente and, further, waive

Empire's $30,000 franchising fee in return for a percentage interest in MSI.  While Gugliuzza

initially demanded a 50% interest, the parties ultimately came to a verbal agreement to provide

Gugliuzza with 35% of the company.  As part of his proposal, Gugliuzza drafted an agreement

which essentially gave Gugliuzza negative control of MSI and its finances.

45.     However, after reaching this verbal agreement, Gugliuzza took no action to

franchise, further promote, or sell MSI.

46.     Just as Defendants did nothing to sell the company, Defendants did absolutely

nothing to make the franchising program a reality, and never produced a single piece of paper

evidencing any effort on their part.  Clemente pleaded with Gugliuzza countless times that due to

the emergence of competition, their window of opportunity was closing, and time was of the

essence.  Despite endlessly representing to Clemente that he should not worry, because "the ball

is rolling," Defendants callously disregarded Plaintiffs interests through a litany of excuses rather

than results.  Gugliuzza was able to placate Plaintiffs into believing that despite the delays,

success was just around the corner.

#1341564 v3
108732-64612

47.     The next four months yielded no cognizable progress whatsoever on the franchising program–no franchise business plan, no franchise marketing plan, no franchisee contracts, no franchisees.  Nothing but unsupported assurances from Gugliuzza that franchising takes time, results were imminent, and Plaintiffs should not worry at all.

48.     After several more months passed without any indication that the franchising program was underway, Plaintiffs asked Gugliuzza for a simple work plan, which would indicate that Gugliuzza knew what he was doing and had a definitive plan designed to finally deliver some concrete results.  Plaintiffs also advised Gugliuzza on countless occasions that they were concerned about the "time factor" – both the time the transaction was taking, and that the more time that went by, the greater the likelihood that the business would lose value due to the emergence of competition that would not have been present had the sale proceeded as promised.

49.     Despite his unwavering, and convincing, assurances that the sale and/or franchising of MSI was proceeding according to plan and constantly on the brink of prosperity, in actuality, Empire had:

        a.      no clear plan for selling the company;

        b.      no plan to franchise the company;

        c.      no identifiable buyers; and

        d.      not even engaged in the most rudimentary measures to sell or franchise the business.

50.     When pressed for documentation, Empire was unable to produce any of the following:

        a.      a draft of a business profile or plan to market the companies;

        b.      a prospect list of potential buyers;

        c.      records of any mailings or phone calls to potential buyers; or

13

        d.      records of meetings or telephone calls with potential buyers;

51.    Thus, after the passage of nearly a year, Defendants had done absolutely nothing to facilitate the sale or franchising of MSI.

52.    Rather than produce any work product as requested by Plaintiffs, Gugliuzza demanded that Clemente sign a comprehensive General Release before proceeding any further, which would relieve Gugliuzza of liability for any past conduct.  Gugliuzza refused to deliver any such work plan or proof of the franchise program's progress until Clemente signed the Release.

53.    The parties reached a stalemate in which Gugliuzza would not provide any work product until Clemente executed the Release, while Clemente would not execute the Release until Gugliuzza provided work product.  Plaintiffs' duress was compounded by the fact that they could not go to another business broker, and were essentially paralyzed from taking any alternative action, because they were running out of money, while Gugliuzza seemingly held 35% and financial control of Plaintiffs' company.

54.    When Plaintiffs failed to break the stalemate over the Release, Gugliuzza abandoned Plaintiffs, cutting off all communications and breaking all ties, including reneging on the verbal partnership agreement.  Despite efforts by Clemente to move forward with the project, nothing was resolved.  Clemente became so upset, that he had a heart attack, was hospitalized for acute stress, and has suffered serious and permanent damage to his overall health.  When Plaintiffs reached Gugliuzza on the phone one final time, Gugliuzza told Plaintiffs that everything could be worked out.  This proved to be false hope.  After a series of e-mail

#1341564 v3
108732-64612

communications that ended in May 2005, Plaintiffs chased Gugliuzza for weeks without ever receiving a return call or e-mail.

55.     Plaintiffs, out of desperation, sought other brokers who told Plaintiffs that the passage of time and the growth of competition during the previous two years could have a detrimental impact on the value of the business.  They also advised Plaintiffs to continue with Defendants, as they were fully educated about the company, while it would take them at least 6 months to learn what Defendants knew.

56.     Plaintiffs then contacted each of Empire's brokers upon the belief that they were educated about the company and would hopefully be in a position to help Plaintiffs by recognizing their names in the computer system.   To Plaintiffs' utter dismay, they were absolutely stunned when they learned that even though Empire's brokers receive every listing of every business sold by Empire, not a single Empire broker (other than Caputo) had ever heard of MSI or their company and no listing had ever taken place.  Plaintiffs attempted to contact Gugliuzza, but received no answers.

57.     Unbeknownst to Plaintiffs, Defendants, acting individually and on behalf of each other, fraudulently induced Plaintiffs to enter into the Exclusive Business Listing Agreement, and thereafter committed fraud by misrepresenting, with the fraudulent intent to willfully deceive and/or the reckless disregard of the truth, that:

      a.     Defendants would sell Plaintiffs' company quickly with ease;

      b.     Defendants would get Plaintiffs $30 million or more for their company;

      c.     Defendants had over 100 brokers actively and currently looking to sell Plaintiffs' company;

      d.     Defendants had multiple buyers and offers for Plaintiffs' company;

      e.     A bidding war was underway for Plaintiffs' company;

#1341564 v3
108732-64612

f.      Defendants were working diligently every day on the sale of Plaintiffs'
        company;

g.      The final sale of Plaintiffs' company was imminent; and

h.      Defendants were going to franchise Plaintiffs' company and subsequently
        sell it for more than $300 million.

58.     At all times when said representations were made, Defendants knew or should
have known that they were false, but made them with the intent to deceive Plaintiffs and induce
them to exclusively list MSI with Empire.

59.     Had Plaintiffs known the falsity of Defendants' representations, Plaintiffs would
not have entered into or remained in any business relationship with Defendants.

60.     Defendants acting individually, and on behalf of each other, for the purpose of
defrauding Plaintiffs, and/or in reckless disregard of the truth, omitted to advise Plaintiffs that:

a.      Defendants had no intention of ever selling Plaintiffs' company;

b.      Defendants never made a single effort to sell Plaintiffs' company;

c.      Defendants had never developed the franchise program for Plaintiffs'
        company;

d.      Plaintiffs' company was never listed with Empire's brokers;

e.      Defendants never even attempted to find buyers for Plaintiffs' company;
        and

f.      There was no bidding war for Plaintiffs' company.

61.     Had the aforementioned omissions been truthfully disclosed to Plaintiffs,
Plaintiffs would not have entered into or remained in any business relationship with Defendants.

62.     By engaging in the aforementioned course of conduct, Defendants embarked upon
a 2 ½ year pattern of gross incompetence, gross deception, and manipulation by failing to sell or
even market Plaintiffs' company while at its highest point of saleability and value, despite being

#1341564 v3
108732-64612

retained to do so.   Defendants also damaged Plaintiffs by engaging in a scheme to divert Plaintiffs from their goal of selling their business, in order to misdirect Plaintiffs into a phantom franchising program that never appears to have existed.

63.     As will be established through expert testimony, Defendants' inexcusable course of misconduct severely damaged Plaintiffs by depriving them of the opportunity to sell their very attractive company, and eventually destroying what should have been a multi-million dollar company.

## CAUSES OF ACTION

### FIRST COUNT
### (Alter Ego/Piercing the Corporate Veil)

64.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 63 of the Complaint as if set forth herein at length.

65.     Defendants Gugliuzza, Lori Gugliuzza, and Roberta Caputo are the directors, officers and/or shareholders of one or more Defendants Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc., Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc., and are the principal parties directing the affairs of one or more of the defendant companies (Gugliuzza - all; Lori Gugliuzza, and Roberta Caputo  - one or more).

66.     Defendants Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc., Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc. are all engaged in the same line of business and are closely identified with the affairs of each other.

67.     At all relevant times, Defendants Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc.,

#1341564 v3
108732-64612

Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc., and their officers, directors, and/or shareholders, ignored corporate distinctions and formalities between the defendant business entities.

68.     Gugliuzza, Lori Gugliuzza, and Roberta Caputo so dominated and controlled one or more of Defendants Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc., Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc. that the defendant companies were and are mere instrumentalities of Gugliuzza, Lori Gugliuzza, and Robert Caputo.

69.     Gugliuzza, Lori Gugliuzza, and Robert Caputo's control is and has been so pervasive that they have exclusive control over the corporate decisions relating to the business and operations of one or more of the defendant companies.   In developing this structure, Gugliuzza, Lori Gugliuzza, and Roberta Caputo have created a series of "mere shells," using the corporate forms for their own benefit and substantially disregarding the separate nature of each entity.

70.     Through the use of these corporate forms, and by virtue of the aforementioned conduct, these business entities were used to commit various wrongs.

71.     There exists and existed, at all relevant times hereto, a substantial identity of interests between Defendants Empire Business Solutions, LLC, Empire Business Brokers, Inc., Empire Business Brokers USA, Business Brokers of America, Inc., Empire Business Solutions, Inc., Empire Global Strategies, Inc., Empire Business Associates, Inc. such that the defendant companies are one in the same and mere alter egos of one another.

#1341564 v3
108732-64612

72.     As a result of the foregoing, Plaintiffs are entitled to pierce the corporate veil and look to the assets of any of the alter-ego companies and/or Defendants Gugliuzza, Lori Gugliuzza, and Roberta Caputo to satisfy their claims.

## SECOND COUNT
### (Breach of Contract)

73.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 72 of the Complaint as if set forth herein at length.

74.     Clemente contracted with Empire, by way of an Exclusive Business Listing Agreement, providing Empire with "the exclusive right to sell or exchange" MSI.

75.     Plaintiffs adequately and timely performed its obligations under the terms of the agreement, granting to Empire the exclusive listing and providing payment of $10,000.

76.     By virtue of the aforementioned conduct, Defendants breached the Exclusive Listing Agreement, by, without limitation, failing to take any action to promote, market, or sell Plaintiffs' business, or provide the listing to any of brokers throughout its national network of brokers.

77.     Defendants' aforementioned conduct constitutes a breach of contract, as a result of which Plaintiffs have suffered significant harm and damage.

## THIRD COUNT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 77 of the Complaint as if set forth herein at length.

79.     The Agreement between Plaintiffs and Defendants requires Defendants to exercise, at all times, the utmost good faith and to deal fairly at all times with Plaintiffs in

#1341564 v3
108732-64612

carrying out its duties and obligations under the Agreement by reason of the implied covenant of good faith and fair dealing.

80.     By its conduct in failing to take any action under the Agreement, as described above, Defendants have significantly impaired the benefit of that agreement for Plaintiffs and have breached the implied covenant of good faith and fair dealing, causing significant damage to Plaintiffs.

81.     Defendants' aforementioned conduct constitutes a breach of the implied covenant of good faith and fair dealing, as a result of which Plaintiffs have suffered significant harm and damage.

### **FOURTH COUNT**
### **(Fraud in the Inducement)**

82.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 81 of the Complaint as if set forth herein at length.

83.     The Defendants, individually and/or through their authorized agent, made numerous fraudulent, material misrepresentations to Clemente in order to induce his payment and execution of the Exclusive Business Listing Agreement.  Those material misrepresentations included, without limitation, that (1) MSI would be an "easy sale"; (2) the sale of MSI would generate in excess of $30 million; and (3) Gugliuzza already had buyers for the company - a group of European doctors.

84.     Defendants knew these statements were fraudulent and untruthful at the time they were made.

85.     Plaintiffs reasonably relied upon those false statements at the time they were made and when it entered the Exclusive Business Listing Agreement.

20

86.     Plaintiffs would not have entered into the Exclusive Business Listing Agreement had those false representations not been made.

87.     The Defendants knew such representations were material to Plaintiffs and were made to induce Plaintiffs to enter the Exclusive Business Listing Agreement.   Plaintiffs justifiably relied on such misrepresentations to its detriment in entering into the Exclusive Business Listing Agreement.

88.     The Defendants owed Plaintiffs a duty to ensure that their representations were complete, truthful, and accurate.

89.     As a result of Defendants' misrepresentations, Plaintiffs have been damaged and incurred losses.

## FIFTH COUNT
### (Common Law Fraud)

90.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 89 of the Complaint as if set forth herein at length.

92.     The Defendants, individually and/or through their authorized agent, made numerous fraudulent material misrepresentations of presently existing or past facts to Plaintiff in order to induce his payment and execution of the Exclusive Business Listing Agreement, prevent Plaintiffs from seeking out competitive business brokers to assist in the sale of MSI during the course of and following the expiration of the initial term of the Exclusive Business Listing Agreement, induce Plaintiffs to renew the Exclusive Business Listing Agreement, persuade Plaintiffs to franchise MSI and permit Defendants to perform the franchising work, and induce Plaintiffs to transfer a percentage interest in MSI to Gugliuzza.   Those material misrepresentations included, without limitation, that (1) MSI would be an "easy sale"; (2) the sale of MSI would generate in excess of $30 million; (3) Gugliuzza had a group of European

#1341564 v3
108732-64612

doctors interested in purchasing the company; (4) Gugliuzza located two doctors from St. Lucia that were interesting in buying MSI; (5) an investor from South America was interested in acquiring Plaintiffs' company; (6) Gugliuzza found a multi-level nutrition company interested in buying MSI; (7) Gugliuzza was in talks with a chiropractic equipment company to purchase MSI; (8) Bayer was interested in acquiring MSI; (9) a deal was reached with a medical equipment company for the purchase of MSI in the approximate amount of $35 million; (10) Defendants had over 100 brokers actively and currently looking to sell Plaintiffs' company; (11) a bidding war was underway for Plaintiffs' company; and (12) Defendants were going to franchise Plaintiffs' company and subsequently sell it for more than $300 million.

93.     Defendants knew these statements were fraudulent and untruthful at the time they were made and were stated with the intention that Plaintiffs rely on such misrepresentations.

94.     Plaintiffs reasonably relied upon those false statements at the time they were made.

95.     These representations were material to Plaintiffs and were made to induce Plaintiffs' payment and execution of the Exclusive Business Listing Agreement, prevent Plaintiffs from seeking out competitive business brokers to assist in the sale of MSI during the course of and following the expiration of the initial term of the Exclusive Business Listing Agreement, induce Plaintiffs to renew the Exclusive Business Listing Agreement, persuade Plaintiffs to franchise MSI and permit Defendants to perform the franchising work, and induce Plaintiffs to transfer a percentage interest in MSI to Gugliuzza.  Plaintiffs justifiably relied on such misrepresentations to its detriment in entering into the Exclusive Business Listing Agreement, remaining with Defendants and not seeking competitive business brokers to assist in the sale of MSI, renewing the Exclusive Business Listing Agreement following the expiration of

#1341564 v3
108732-64612

its initial term, agreeing to franchising of MSI and permitting Defendants to perform all necessary franchising work, and agreeing to transfer a percentage interest in MSI to Gugliuzza.

96.     The Defendants owed Plaintiffs a duty to ensure that their representations were complete, truthful, and accurate.

97.     As a result of Defendants' misrepresentations, Plaintiffs have been damaged and incurred losses.

## SIXTH COUNT
### (Tortious Interference With Prospective Business Relations)

98.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 97 of the Complaint as if set forth herein at length.

99.     When Plaintiffs entered into the Exclusive Business Listing Agreement, it had a reasonable expectation that it would receive a reasonable return for the sale of MSI, repeatedly guaranteed by Defendants to be in excess of $30 million.  After being convinced by Defendants to franchise MSI, Plaintiffs had a reasonable expectation, based on Defendants' own assurances, of receiving a return in excess of $300 million.

100.     Defendants had full knowledge of Plaintiffs' expectancy considering that such expectancy was a result of Defendants' promises, assurances, and guarantees.

101.     The Defendants' wrongful actions, or lack thereof, described more fully herein, have significantly interfered with Plaintiffs' opportunity to receive the prospective benefits of the sale of MSI.

102.     Plaintiffs' reasonable expectation of economic advantage would have been realized, but for Defendants' wrongful and/or intentional interference.

#1341564 v3
108732-64612

103.    Defendants' aforementioned conduct constitutes tortious interference with Plaintiffs' prospective economic advantage, as a result of which Plaintiffs have suffered significant harm and damages.

### SEVENTH COUNT
### (New Jersey Consumer Fraud Act)

104.    Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 103 of the Complaint as if set forth herein at length.

105.    Plaintiff Michael Clemente, is a "person" as defined by the New Jersey Consumer Fraud Act under N.J.S.A. 56:8-1 et seq. (the "Act").

106.    Plaintiff Clemente engaged the services of Defendants to market and sell MSI. Defendants' services, offered directly to the public for sale, constitute "merchandise" as defined by the Act under N.J.S.A. 56:8-1 et seq. (the "Act").

107.    By failing to take any action in furtherance of the sale of MSI or provide the listing of MSI to any of its national network of business brokers, Defendants engaged in unconscionable commercial practices.  Furthermore, in stating to Clemente that (1) MSI would be an "easy sale"; (2) the sale of MSI would generate in excess of $30 million; (3) Gugliuzza had a group of European doctors interested in purchasing the company; (4) Gugliuzza located two doctors from St. Lucia that were interesting in buying MSI; (5) an investor from South America was interested in acquiring Plaintiffs' company; (6) Gugliuzza found a multi-level nutrition company interested in buying MSI; (7) Gugliuzza was in talks with a chiropractic equipment company to purchase MSI; (8) Bayer was interested in acquiring MSI; (9) a deal was reached with a medical equipment company for the purchase of MSI in the approximate amount of $35 million; (10) Defendants had over 100 brokers actively and currently looking to sell Plaintiffs' company; (11) a bidding war was underway for Plaintiffs' company; and (12) Defendants were

24

going to franchise Plaintiffs' company and subsequently sell it for more than $300 million, Defendants employed deception, fraud, false pretenses, false promises, and misrepresentations in connection with its services.

108.   By virtue of the aforementioned conduct, Defendants' actions and/or inactions constitute unconscionable commercial practices, and, further, its deception, fraud, false pretenses, false promises, and misrepresentations in connection with its services to Plaintiff Clemente violate the Act.

109.   As a direct and proximate result of the consumer fraud perpetrated by Defendants, Plaintiffs have suffered an ascertainable loss, has been damaged, and are entitled to be compensated for all damages resulting to it as a result of the unlawful conduct.

**EIGHTH COUNT**
**(Negligence/Malpractice)**

110.   Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 109 of the Complaint as if set forth herein at length.

111.   As business brokers, Defendants were retained by Plaintiffs to provide professional services to Plaintiffs in locating, developing, and fostering the sale of MSI.

112.   The Defendants owed Plaintiffs a duty to act with due care by exercising a level of skill and competence reasonable for a business broker engaged in a transaction of the nature and magnitude of MSI.

113.   By virtue of the aforementioned conduct, or lack thereof, the Defendants breached their duty to Plaintiffs and were negligent and/or committed professional malpractice.

114.   The allegations of specific instances of negligence and/or professional malpractice set forth in this Complaint are not exhaustive and are without prejudice to further acts of malpractice that may become apparent as this action progresses.

25

115.    It was foreseeable and, on information and belief, the Defendants knew and were aware that their acts complained of in this Complaint would cause direct, incidental and consequential damage to Plaintiffs.

116.    Plaintiffs have suffered direct, incidental and consequential damages by the acts of negligence and/or professional malpractice set forth herein, and are therefore entitled to be compensated for all damages resulting to it as a result of the unlawful conduct.

## NINTH COUNT
### (Intentional Misrepresentation)

117.    Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 116 of the Complaint as if set forth herein at length.

118.    Defendants, individually and through their authorized agent, knowingly, without belief in the truth, or in reckless or careless disregard of the truth, made false representations of material facts to Plaintiffs.  Those material misrepresentations included, without limitation:  (1) MSI would be an "easy sale"; (2) the sale of MSI would generate in excess of $30 million; (3) Gugliuzza had a group of European doctors interested in purchasing the company; (4) Gugliuzza located two doctors from St. Lucia that were interesting in buying MSI; (5) an investor from South America was interested in acquiring Plaintiffs' company; (6) Gugliuzza found a multi-level nutrition company interested in buying MSI; (7) Gugliuzza was in talks with a chiropractic equipment company to purchase MSI; (8) Bayer was interested in acquiring MSI; (9) a deal was reached with a medical equipment company for the purchase of MSI in the approximate amount of $35 million; (10) Defendants had over 100 brokers actively and currently looking to sell Plaintiffs' company; (11) a bidding war was underway for Plaintiffs' company; and (12) Defendants were going to franchise Plaintiffs' company and subsequently sell it for more than $300 million.

#1341564 v3
108732-64612

119.    The statements made to Plaintiffs by the Defendants were made with the purpose of inducing Plaintiffs to act upon those false representations.

120.    In reliance on those representations, Plaintiffs paid to Defendants the sum of $10,000, entered into the Exclusive Business Listing Agreement, did not seek out competitive business brokers to assist in the sale of MSI during the course of and following the expiration of the initial term of the Exclusive Business Listing Agreement, renewed the Exclusive Business Listing Agreement, agreed to franchise MSI and permit Defendants to perform the franchising work, and agreed to transfer a percentage interest in MSI to Gugliuzza.  Plaintiffs would not have agreed to any of the aforementioned had the truth been disclosed.

121.    Those false representations proximately caused Plaintiffs to enter into the Exclusive Business Listing Agreement, remain with Defendants throughout the term of the Exclusive Business Listing Agreement and thereafter, agree to franchise MSI and permit Defendants to perform the franchising work, and as a result of Defendants' misrepresentations, Plaintiffs have been damaged and incurred losses.

### TENTH COUNT
#### (Negligent Misrepresentation)

122.    Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 121 of the Complaint as if set forth herein at length.

123.    Defendants, individually and through their authorized agent, negligently made false representations of material facts to Plaintiffs.  Those material misrepresentations included, without limitation:  (1) MSI would be an "easy sale"; (2) the sale of MSI would generate in excess of $30 million; (3) Gugliuzza had a group of European doctors interested in purchasing the company; (4) Gugliuzza located two doctors from St. Lucia that were interesting in buying

#1341564 v3
108732-64612

MSI; (5) an investor from South America was interested in acquiring Plaintiffs' company; (6) Gugliuzza found a multi-level nutrition company interested in buying MSI; (7) Gugliuzza was in talks with a chiropractic equipment company to purchase MSI; (8) Bayer was interested in acquiring MSI; (9) a deal was reached with a medical equipment company for the purchase of MSI in the approximate amount of $35 million; (10) Defendants had over 100 brokers actively and currently looking to sell Plaintiffs' company; (11) a bidding war was underway for Plaintiffs' company; and (12) Defendants were going to franchise Plaintiffs' company and subsequently sell it for more than $300 million.

124.     Plaintiffs would not have paid to Defendants the sum of $10,000, entered into the Exclusive Business Listing Agreement, refrained from seeking out competitive business brokers to assist in the sale of MSI during the course of and following the expiration of the initial term of the Exclusive Business Listing Agreement, renewed the Exclusive Business Listing Agreement, agreed to franchise MSI, permitted Defendants to perform the franchising work, or agreed to transfer a percentage interest in MSI to Gugliuzza, had the truth been disclosed.

125.     Those false representations proximately caused Plaintiffs to enter into the Exclusive Business Listing Agreement, remain with Defendants throughout the term of the Exclusive Business Listing Agreement and thereafter, agree to franchise MSI and permit Defendants to perform the franchising work, and as a result of Defendants' misrepresentations, Plaintiffs have been damaged and incurred losses.

## ELEVENTH COUNT
### (Breach Of Fiduciary Duty)

126.     Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 125 of the Complaint as if set forth herein at length.

#1341564 v3
108732-64612

127.    As a business broker, Defendants owe a fiduciary duty to any seller that retains them to exercise fidelity, good faith, and primary devotion to the interests of its principal.

128.    Defendants owed a fiduciary duty to Plaintiffs in connection with the Exclusive Business Listing Agreement and the sale of MSI.

129.    With actual knowledge of the existence of these fiduciary obligations, Defendants breached those obligations.

130.    By way of example, Defendants made certain statements to Plaintiffs in the course of soliciting their business, and subsequent to the signing of the Exclusive Business Listing Agreement, that were inaccurate, false, or misleading when made.  Defendants were aware of the statements' inaccuracies, falsities, and ability to mislead Plaintiffs, and permitted Plaintiffs to rely on such misrepresentation in engaging Defendants' services and thereafter.

131.    Defendants, who hold themselves out as specialists in the field of business brokerage, failed to exercise reasonable skill, care, and diligence in performing their undertaking, which constitutes a breach of the fiduciary duty.

132.    As a proximate result of Defendants' breaches of their fiduciary obligations, Plaintiffs suffered damages and incurred loss.

## TWELFTH COUNT
### (Successor Liability)

133.    Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 132 of the Complaint as if set forth herein at length.

134.    In or about August 2006, Gugliuzza formed Defendant Business Brokers of America USA, Inc.

135.    The creation of this corporate entity is merely a restructured form of the predecessor companies, who are named as defendants herein.

#1341564 v3
108732-64612

136.   Defendant Business Brokers of America USA, Inc. is a continuation of the enterprise such that there is a continuity of management, personnel, physical location, assets, and general business operations.  Defendant Business Brokers of America USA, Inc. constitutes a continuation of the predecessor corporate entities.

137.   As a result of the foregoing, Plaintiffs are entitled to look to the assets of the successor company to satisfy their claims.

## THIRTEENTH COUNT
### (Successor Liability)

138.   Plaintiffs repeat and reallege each of the allegations in Paragraphs Nos. 1 through 137 of the Complaint as if set forth herein at length.

139.   On December 15, 2005, Gugliuzza transferred the assets from his company, Empire Business Solutions, Inc. to another company, Empire Global Strategies, Inc., in which he was initially the sole shareholder.  The Purchase Price was $1,125,000.00.

140.   Gugliuzza then sold half the stock of Empire Global Strategies, Inc. to Mirabilis, becoming 50-50 partners with Mirabilis in Empire Global Strategies, Inc.  That Purchase Price was also $1,125,000.00.  Thus Mirabilis's $1,125,000.00 was used twice as consideration, first to transfer the assets from Empire Business Solutions, Inc. to Empire Global Strategies, Inc., and second, for Mirabilis to acquire half of Empire Global Strategies, Inc., thereby intentionally effecting a merger of Mirabilis and Empire.

135.   As a condition for Mirabilis's investment, Empire Global Strategies, Inc. agreed to exclusively use Mirabilis's designated "insurance company for related insurance coverage."

136.   As part of the Franchise Development Program, franchisees were required to refer any target companies for acquisition with a purchase price of $5,000,000.00 or greater, directly to Mirabilis for acquisition.

#1341564 v3
108732-64612

137.    Indeed, the *Business Brokers of America* Franchise Training Program contains a section titled, "OUR PARTNER", stating:

    a.    Mirabilis is a powerful billion dollar corporation that has expanded its influence into 5 continents.

    b.    It's an innovative and inventive international professional services firm.

    c.    The services that the add to the Empire Network takes the income potential for our offices to a whole new level.

    d.    The generous expansion investment and expertise in corporation development will have a profound impact on our growth.

138.    As part of the merger, the parties agreed that for any lawsuit involving an "occurrence" happening before the date of the Closing [such as this case], Mirabilis and Empire Global Strategies, Inc. agreed to provide each other with Litigation Support by making available personnel and books and records.

139.    As part of the merger, Mirabilis had the right to nominate representative members to the Board of Directors, and determine the number of directors.

140.    As part of the merger, if Gugliuzzza was found liable for an obligation of Empire Global Strategies, Inc., then he is entitled to contribution from his fellow shareholder, Mirabilis in an amount equal to their shares of the stock (50%).

141.    As part of the merger, Empire Global Strategies, Inc. had four members of its Board of Directors, with two designated by Gugliuzza and two designated by Mirabilis, with Gugliuzza as the President, his wife Lori as the Vice-President, and Mirabilis designating the Secretary and Treasurer.

142.    As a result of the foregoing transaction, and by operation of law: (1) there was an express and/or implied assumption of Empire's liabilities on the part of Mirabilis; (2) the transaction amounted to an actual or *de facto* consolidation/merger; (3) the ensuing merger was a

#1341564 v3
108732-64612

mere continuation of Empire; and (4) upon information and belief, the transaction on the part of Empire was motivated at least in part, for purpose of escaping Empire's liability to Plaintiffs.

142.    As a result of the foregoing transaction, and by operation of law, the transaction amounted to Mirabilis becoming a "new hat" for Empire, as: (1) there was a continuity of management, personnel, physical location, assets, and general business operations; (2) stock was part of the purchase price for assets; (3) there was an assumption of liabilities ordinarily necessary for the uninterrupted continuation of the business; and (4) there was continuity of ownership/shareholders.

143.    As a result of the foregoing, Plaintiffs are entitled to look to the assets of Mirabilis, its officers and directors, including but not limited to, all insurance policies covering same, to satisfy their claims.

## CERTIFICATION OF NO PENDING ACTIONS

Pursuant to *L. Civ. R. 11.2*, Plaintiffs certify that to the best of their knowledge information and belief, there are no other pending court actions, arbitrations, or administrative proceedings involving the parties and/or subject matter of this case.

## ARBITRATION CERTIFICATION

Pursuant to *L. Civ. R. 201.1*, that the amount in controversy exceeds $150,000.00.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all of the claims so triable alleged herein.

#1341564 v3
108732-64612

**WHEREFORE**, Plaintiffs MSI and Clemente request entry of judgment in its favor and against Defendants as follows:

   a.   Awarding the Plaintiffs such monetary damages as the Plaintiffs may prove at trial, including prejudgment interest;

   b.   Awarding the Plaintiffs treble their actual money damages pursuant to N.J.S.A. 56:8-1 et seq.;

   c.   Awarding the Plaintiffs full reimbursement for all costs of this action, including attorneys' fees;

   d.   Awarding the Plaintiffs punitive and exemplary damages; and,

   e.   Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: December 30, 2010            **LAW OFFICES OF
                                    MICHAEL S. KASANOFF, ESQ.**


                                    By:   S/Michael S. Kasanoff

                                          Attorneys for Plaintiffs
                                          Medical Marketing Specialists, Inc.
                                          Michael Clemente

33

#1341564 v3
108732-64612